# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ALEIA TOUSIS, as Special Administrator of  )
the Estate of GUS TOUSIS,                   )
                                            )
                          Plaintiff,        )     No. 20 C 3012
                                            )
            v.                              )     Judge Coleman
                                            )
SPECIAL AGENT KEITH BILLIOT,                )     Magistrate Judge Cox
                                            )
                          Defendant.        )

## PLAINTIFF'S L.R. 56.1 STATEMENT OF MATERIAL FACTS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Aleia Tousis, as Special Administrator of the Estate of Gus Tousis, by and through her attorneys, Gregory E. Kulis & Associates, Ltd., submits the following statement of material facts, pursuant to Local Rule 56.1 ofthe United States District Court for the Northern District of Illinois, as to which there are a great deal of genuine disputes:

### Jurisdiction and Venue

1.      This is an individual-capacity lawsuit alleging a Fourth Amendment violation under *Bivens v. Six Unknown Named Agents of Fed'l Bureau of Narcotics*, 403 U.S. 388 (1971). Dkt. 30 (Answer) ¶¶ 1, 15.

**RESPONSE: Admit.**

2.      Venue is proper in this district because the action arises out of events that allegedly occurred in the Northern District of Illinois. Dkt. 30 (Answer) ¶¶ 5, 8.

**RESPONSE: Admit.**

### Parties

3.      The plaintiff is Aleia Tousis, special administrator of the estate of Gus Tousis. Dkt.

30 (Answer) ¶ 1.

**RESPONSE: Admit.**

4. The defendant is Drug Enforcement Administration Special Agent Keith Billiot. Dkt. 30 (Answer) ¶ 4.

**RESPONSE: Admit.**

## Background

5. Special Agent Billiot worked for the Drug Enforcement Administration for 29 years, from 1991 until his retirement in 2020. Ex. A (Billiot Dep.) at 11:2-9, 19:16-22.

**RESPONSE: Admit.**

6. After being hired in 1991, Special Agent Billiot ranked number one in his class of 40 or 50 agents at the DEA's training facility in Quantico, Virginia. Ex. A (Billiot Dep.) at 11:24-12:18.

**RESPONSE: Admit.**

7. Special Agent Billiot joined the DEA's Chicago office in September 2014 as a supervisory special agent, the same title he had held in the DEA's New Orleans office in 2012 before spending a nearly two-year term training police officers in Afghanistan from 2012 to 2014. Ex. A (Billiot Dep.) at 17:22-19:7, 25:12-19.

**RESPONSE: Admit.**

8. As a supervisory special agent, Special Agent Billiot was involved in "numerous drug investigations" in the Chicago area. Ex. A (Billiot Dep.) at 25:20-24.

**RESPONSE: Admit.**

9. Special Agent Billiot carried, and was qualified to carry, a Glock semi-automatic pistol and a rifle called a "carbine," which is a DEA agent's primary weapon. Ex. A (Billiot Dep.)

at 22:4-23:2, 40:3-5, 62:4-9.

**RESPONSE: Admit.**

10.     Special Agent Billiot kept his carbine adjacent to his right leg in his DEA vehicle.
Ex. A (Billiot Dep.) at 40:6-19.

**RESPONSE: Admit.**

11.     On June 2, 2018, the magazine of Special Agent Billiot's carbine was loaded with
29 of a possible 30 rounds.  Ex. A (Billiot Dep.) at 23:3-24:18.

**RESPONSE: Admit to the extent that Defendant Billiot testified that carbine was loaded
with 29 of a possible 30 rounds, with the additional information that Billiot's carbine had
one bullet in the chamber. Defendant's Ex. A (Billiot Dep.), 69: 8-10 ("Q: Why; because there
was one in the chamber already?; A: That's correct, yes, sir.").**

### Surveillance of Gus Tousis on June 2, 2018

12.     The DEA began investigating Gus Tousis as early as December 2017. Ex. A (Billiot
Dep.) at 26:5-16. Special Agent Billiot was not the lead investigator but was involved in his
capacity as a supervisory special agent overseeing all of the investigators in his group. *Id*. at 26:17-
27:21.

**RESPONSE: Admit.**

13.     On the morning of June 2, 2018, Special Agent Billiot's understanding was that
Tousis was "involved in drug trafficking," that Tousis had a "source of supply" named Vernon
Turner who lived in the Aurora area, and that the investigating agents believed that Tousis would
that morning travel to Turner's residence "to procure an unknown amount of drugs." Ex. B (Billiot
Dep.) at 27:23-28:18, 38:4-12; Ex. B (Boehnke Dep.) at 14:9-16:20.

**RESPONSE: Admit.**

14.     Pursuant to a warrant, a court-authorized tracker had been placed on Tousis's SUV

that allowed the agents to know its location.  Ex. A (Billiot Dep.) at 28:20-29:8, 36:22-37:3; Ex.

B (Boehnke Dep.) at 25:11-16; Ex. C (complaint for search warrant and warrant).

**RESPONSE: Admit.**

      15.    Special Agent Billiot's understanding on June 2, 2018, was that Tousis had had a

number of drug arrests as well as arrests for other offenses. Ex. A (Billiot Dep.) at 29:10-18; Ex.

D (Tousis arrest history) (showing six arrests between 1997 and 2013, for controlled-substance

possession, criminal trespass to vehicle, and other offenses).

**RESPONSE: Admit.**

      16.    Special Agent Billiot's understanding on June 2, 2018, was that Tousis was

suspected of dealing or transporting cocaine and heroin.  Ex. A (Billiot Dep.) at 29:19-30:5.

**RESPONSE: Admit.**

      17.    The DEA agents' plan on June 2, 2018, was to observe Tousis procure illegal drugs

and then arrest him to prevent the drugs from being distributed. Ex. A (Billiot Dep.) at 30:16- 31:8,

37:20-38:3.

**RESPONSE: Admit.**

      18.    Early on June 2, 2018, DEA Task Force Officer Robert Boehnke traveled to

Turner's home in an unmarked, covert vehicle and observed Tousis arrive in a silver or gray SUV,

enter Turner's garage carrying a bag, and then leave, with the bag's appearance having changed.

Ex. B (Boehnke Dep.) at 16:21-17:14, 22:1-24:5; Ex. E (DEA Report of Investigation) at

DEA_0115; Ex. F (Police Report) at DEA_0080 ("Tousis entered the target vehicle and was

observed engaging in a suspect narcotics transaction."). Boehnke was "calling it out" over the

agents' radio as he observed Tousis's actions. Ex._(Boehnke Dep.) at 23:11-16.

**RESPONSE: Admit.**

      19.    Special Agent Billiot understood from his fellow agents that Tousis had arrived at

Turner's residence carrying a package and entered Turner's garage, that the garage door had closed, that Tousis departed "shortly thereafter," and that the agents "had reason to believe that what we saw is what they anticipated would happen." Ex. A (Billiot Dep.) at 40:22-41:20.

**RESPONSE: Admit.**

### First Attempted Arrest of Gus Tousis

20. The DEA agents enlisted the DuPage County Sheriff's Department to conduct a traffic stop of Tousis's SUV, but when the officer attempted to do so Tousis drove away at "dangerous speeds." Ex. B (Boehnke Dep.) at 27:1-11; Ex. E (DEA Report of Investigation) at DEA_0116 ("TFO Almaguer observed Officer O'Neil attempt to conduct a traffic stop of TOUSIS at approximately I-88 and Yackley Avenue. TOUSIS initially changed several lanes of traffic into the far right lane and then suddenly accelerated to very dangerous speeds. The Target Vehicle was last observed weaving in and out of traffic at dangerous speeds."); Ex. F (Police Report) at DEA_0080 ("The task force contacted P.O. Patrick O'Neil of the DuPage County Sheriff's Department and requested his assistance in performing a traffic stop of the target vehicle. They were informed the target vehicle refused to stop and was fleeing eastbound on route 88 at a high rate of speed.").

**RESPONSE: Admit to the extent that Tousis drove away at a dangerous speed, but with the additional information that there was no active, sustained police chase. Defendant's Ex. B (Boehnke Dep.), 31: 23 ("A: No one was on his tail the entire time.").**

21. While fleeing eastbound on the highway, Tousis's vehicle reached a high speed of over 114 miles per hour. Ex. G (Braun Dep.) at 33:19-34:13; Ex. E (DEA Report of Investigation) at DEA_0116 ("The electronic tracking device installed on the TARGET VEHICLE identified the vehicle as accelerating from 64.6 Miles per hour to a speed of 115.2 miles per hour."); Ex. H (Supplementary Police Report) at DEA_0069 ("The information on the disc confirmed Agent

Billiot's statement that the vehicle driven by Gus Tousis was travelling recklessly in that the vehicle had been tracked as exceeding 114 miles per hour as it travelled throughout the city and suburbs.").

**RESPONSE: Admit to the extent that Tousis's vehicle reached a high speed of over 114 miles per hour, but with the additional information that Tousis did not maintain that speed down the expressway, because he had slowed at certain points. Defendant's Ex. B (Boehnke Dep.), 28: 6-8 ("A: So he [Tousis] didn't maintain that full speed all the way there. So at certain points, he slowed down.").**

22.     Special Agent Billiot's understanding was that a DuPage County Sheriff's Deputy tried to stop Tousis after Tousis began driving eastbound on Interstate 88, but that Tousis "fled from the deputy at a high rate of speed." Ex. A (Billiot Dep.) at 42:9-43:21; Ex. H (Supplementary Police Report) at DEA_0069 ("Agent Billiot related he was informed by team members that the target had fled a traffic stop and was currently travelling eastbound on 290 at a high rate of speed").

**RESPONSE: Admit.**

23.     Special Agent Billiot was "somewhere behind" Tousis on Interstate 88 when he became aware that Tousis had fled from the deputy. Ex. A (Billiot Dep.) at 43:22-44:3.

**RESPONSE: Admit.**

24.     Special Agent Billiot was communicating with his fellow agents over their radio system at the time. Ex. A (Billiot Dep.) at 44:4-6.

**RESPONSE: Admit.**

25.     Special Agent Billiot was driving a black, unmarked Dodge Durango that was equipped with multiple emergency lights and a "very loud siren." Ex. A (Billiot Dep.) at 39:6-23.

**RESPONSE: Admit to the extent that Defendant Billiot's DEA issued-vehicle is modified with such equipment, but with the additional information that Defendant Billiot did not activate**

6

these lights or sirens during his covert pursuit of Tousis—not on the expressway, not when exiting the expressway, not down Central Avenue, not across Roosevelt, or north on Central. Defendant's Ex. A (Billiot Dep.), 47: 6-8 ("Q: Was your [Billiot] emergency lights activated?; A: Not at that point, no, sir."); 48: 7-9 ("Q: When you [Billiot] exited and turned southbound, did you activate your emergency lights?; A: No, sir, I did not."); 50: 1-3 ("Q: Going westbound?; A: Yes, sir, that's correct.; Q: Were your [Billiot] emergency lights activated?; A: No, sir, they were not."); 52: 21-23 ("A: Once I [Billiot] was able to actually turn onto Central, yes, sir I was.; Q: Did you activate your emergency lights then?; A: Not initially after I made the turn.").

### Continued Surveillance of Tousis

26.     Once Tousis fled from the deputy, the agents' plan was "to continue eastbound on 88 as well as to see if we could perhaps catch up with him and then continue with the plan all along which had been hopefully follow him to either his home or someplace else where he would get out of the car and attempt to apprehend him at that point." Ex. A (Billiot Dep.) at 44:7-14.

**RESPONSE: Admit.**

27.     Special Agent Billiot eventually was able to see Tousis's SUV on Interstate 290, and he followed Tousis off of the highway and onto southbound Central Avenue in Chicago. Ex. A (Billiot Dep.) at 44:15-20; Ex. F (Police Report) at DEA_0080 ("The target vehicle exited the expressway at Central Avenue and proceeded southbound.").

**RESPONSE: Admit to the extent that Defendant Billiot followed Tousis off the expressway onto southbound Central, but with the additional information that Tousis was not driving at a high rate of speed when he exited the expressway and there was no active police chase at the time. Defendant's Ex. A (Billiot Dep.), 48: 10-15 ("Q: Was he [Tousis] going at a high rate of speed?; A: Not at that point.; Q: Right before he exited the ramp at Central, did he –**

7

**was he going a high rate of speed?; A: No, sir, he was not.”); 48: 16-21 (“Q: So there was nobody chasing him [Tousis] with any emergency lights at that point?; A: No, sir, there was not.; Q: Did the sheriff's deputy abandon that chase?; A: Yes, sir, way back in the Aurora area.”).**

28.     Special Agent Billiot followed Tousis southbound on Central Avenue to Roosevelt Road, where Tousis made a right-hand (westbound) turn, which Special Agent Billiot did as well. Ex. A (Billiot Dep.) at 49:9-50:2.

**RESPONSE: Admit.**

29.     Tousis turned north off of Roosevelt quickly enough that, by the time Special Agent Billiot turned onto Roosevelt, he could no longer see Tousis's SUV.  Ex. A (Billiot Dep.) at 50:5-14.  Special Agent Billiot realized that Tousis “had to have turned north” and “also heard radio traffic” indicating that Tousis “was going northbound through some parking lot area.”  *Id*. at 50:15-51:1.

**RESPONSE: Admit.**

30.     Special Agent Billiot conducted a U-turn on Roosevelt and then turned left, or northbound, back onto Central.  Ex. A (Billiot Dep.) at 51:12-15.

**RESPONSE: Admit.**

31.     Upon turning back onto Central Avenue, Special Agent Billiot saw Tousis's SUV, which had also turned northbound onto Central.  Ex. A (Billiot Dep.) at 51:16-52:2 (“Once I turned northbound on Central, I could actually see him.  He had exited the parking lot area that he was in . . . before I could make that left-hand turn to go north on Central, he had already turned onto Central, he just turned on and he proceeded north on Central.”).

**RESPONSE: Admit.**

32.     Tousis's movements convinced Special Agent Billiot that Tousis knew he was

being followed by law enforcement.  Ex. A (Billiot Dep.) at 52:24-53:4.

**RESPONSE: Admit.**

33.  Tousis proceeded north on Central, in the lane closest to the median, with Special Agent Billiot following in the outside lane.  Ex. A (Billiot Dep.) at 53:5-8.

**RESPONSE: Admit.**

34.  Central Avenue in that part of Chicago has two lanes in each direction, northbound and southbound, separated by a median. Ex. A (Billiot Dep.) at 49:3-6.

**RESPONSE: Admit.**

**Second Attempted Arrest of Gus Tousis**

35.  As Special Agent Billiot approached and passed Tousis on Tousis's right-hand side, Special Agent Billiot saw that they were approaching a red light with two cars ahead of Tousis in Tousis's lane.  Ex. A (Billiot Dep.) at 53:5-12, 54:17-55:4.

**RESPONSE: Admit.**

36.   Special Agent Billiot decided to arrest Tousis then and there, "given that we believed that he knew we were following him and what we had experienced in Aurora, which was when he knew that law enforcement was following him, he fled at a high rate of speed, given our overall concern for everyone involved and the fact that we had a red light, I made the decision hey, let's try to stop him now.  He's—he can't go—he—unless he runs into these cars, he's got to stop." Ex. A (Billiot Dep.) at 53:13-21; Ex. H (Supplementary Police Report) at DEA_0069 ("He [Billiot] decided due to the evasive and dangerous actions of the target it was necessary to apprehend him before he caused any injury to himself or others.").

**RESPONSE: Admit.**

37.  Special Agent Billiot communicated over the radio that he would pull in front of Tousis and instructed DEA Task Force Officer Robert Boehnke to come up from behind. Ex. A

(Billiot Dep.) at 53:22-54:9 ("I'll pull in front of him, this is over the radio; Bob, you come up behind him, go behind him and we'll attempt to . . . apprehend him before he can jeopardize . . . either us or anyone, any civilians that are just driving around that morning or walking around that morning."); Ex. B (Boehnke Dep.) at 35:4-15 ("Keith said, hey, let's get him at the red light, try and box him in, but I had cars in front of me and I was still behind. So Keith pulled in front of him with his lights on. I was still playing catch up trying to get there.").

**RESPONSE: Admit.**

38.     Special Agent Billiot turned on his lights and siren and pulled into the gap between Tousis and the two cars that were already stopped at the red light, in the left-hand northbound lane, and put his vehicle in park. Ex. A (Billiot Dep.) at 55:5-20, 60:1-3; Ex. B (Boehnke Dep.) at 35:22-36:6 ("traffic was stopping, so Keith cut in front to block him with his lights on"), 37:12- 24, 39:11-21 ("he would have been somewhat in front of Tousis's vehicle the way he blocked him."); Ex. G (Braun Dep.) at 60:2-11 ("He [Billiot] would have went alongside the passenger side and positioned it [his car] to cordon him [Tousis] off so he [Tousis] could not go forward.");Ex. H (Supplementary Police Report) at DEA_0069 ("Agent Billiot positioned his vehicle in frontof the target's vehicle slightly on an angle to limit the avenue of escape.").

**RESPONSE: Admit to the extent that Billiot turned on his lights and sirens and pulled into the gap in front of Tousis's vehicle, with the additional information that Billiot pulled in front of Tousis's vehicle at a northwestern angle, positioning his [Billiot] driver's side door directly in front of Tousis's vehicle. Defendant's Ex. B (Boehnke Dep.), 39: 7-14 ("Q: So you indicated that when Billiot pulled in front of Tousis facing northwest, he – you saw him [Billiot] jump out of the car?; A: Yes.; Q: And was his driver's door lined up with the front of Tousis's car?; A: I mean what do you mean by lined up? I mean at some point, yeah."); Defendant's Ex. A (Billiot Dep.), 59: 4-7 ("Q: You're a sitting duck because your door – I**

**mean, his [Tousis's] car is aimed directly at your driver's door, correct? A: That is true.");**
**57: 6-8 ("Q: [Y]our [Billiot] driver door is closer to his vehicle than your passenger door at**
**this point?; A: Yes, sir.").**

39.     Special Agent Billiot did not pull his vehicle in front of Tousis's at a high rate of
speed.  Ex. A (Billiot Dep.) at 55:11 ("There was no high rate [of] speeds at this point.").

**RESPONSE: Deny, as Defendant Billiot cut Tousis's vehicle off, implying at least a short**
**period of time in which Billiot accelerated to a high rate of speed and Tousis stopped**
**abruptly. Defendant's Ex. A (Billiot Dep.), 56: 23—57: 2 ("Q: So you [Billiot] cut him**
**[Tousis] off?; A: Yes, sir.; Q: And did he [Tousis] slam on the breaks?; A: He [Tousis] came**
**to a stop pretty abruptly.").**

40.     Special Agent Billiot exited his vehicle wearing a law enforcement vest that
identifies the wearer as a law enforcement officer with "big, bright yellow letters" and a DEA
badge or insignia. Ex. A (Billiot Dep.) at 60:4-10, 61:12-62:3; Ex. B (Boehnke Dep.) at 41:10-12
("He had his DEA vest on.").

**RESPONSE: Admit to the extent that Defendant Billiot exited his vehicle wearing a law**
**enforcement vest, but with the additional information that he exited his vehicle toting his**
**carbine rifle. Defendant's Ex. A (Billiot Dep.), 60: 9-10 ("A: I immediately grabbed my**
**carbine and exited my vehicle."); Defendant's Ex. B (Boehnke Dep.), 40: 9-10 ("Q: Did he**
**[Billiot] have anything in his hands?; A: He had his rifle.").**

41.     Either before or after Special Agent Billiot exited his vehicle, Tousis put his SUV
into reverse and began to reverse quickly. Ex. A (Billiot Dep.) at 55:21-56:5, 60:4-10, 92:7-18
(recalling that Tousis began reversing before Special Agent Billiot exited his vehicle); Ex. H
(Supplementary Police Report) at DEA_0069 (stating that Tousis began reversing after Special
Agent Billiot exited his vehicle); Ex. B (Boehnke Dep.) at 41:24-42:2 (Q: "And what's the next

thing you saw or heard?" A: "I saw some reverse lights go on Tousis's car."); Ex. G (Braun Dep.) at 60:2-11 ("Tousis had to back up because the vehicles were so close. Otherwise, he would have struck Billiot's vehicle. He couldn't drive forward. He had to back up first and then veer sharply to get away and try to go eastbound.").

**RESPONSE: Deny, as Boehnke testified that he saw reverse lights go on but did not testify to actually witnessing the vehicle reverse, Det. Braun was not present on scene and did not witness the incident so his testimony is hearsay and should be discounted, and because Shaun Haymond did not observe Tousis's vehicle move in reverse, which is admittedly in dispute by Defendant's own claimed statement of undisputed material fact. Defendant's SOF ¶ 70; Defendant's Ex. O (Supplementary Police Report) at DEA 0061 ("Haymond related that he did not observe the vehicle move in reverse.").**

42.     Special Agent Billiot's concern when Tousis started driving in reverse was that Tousis would "run into someone that was coming northbound, either Bob [Boehnke] or anyone else, any civilian because the roadway was not blocked off." Ex. A (Billiot Dep.) at 60:11-61:7.

**RESPONSE: Deny, as Boehnke testified that he was still driving and some distance back from Tousis and Defendant Billiot's vehicles and was over a hundred yards away when Defendant Billiot pulled his vehicle in front of Tousis's vehicle. Defendant's Ex. B (Boehnke Dep.), 36: 12-15 ("A: I was still driving, I was some distance back."); 38: 5-8 ("Q: When he [Billiot] pulled in front of Tousis, how far was Billiot's vehicle from Tousis's vehicle?; A: I – I have no idea. I was still – I was still over a hundred yards away driving.")**

43.     Upon exiting his vehicle, Special Agent Billiot did not immediately aim his carbine at Tousis. Ex. A (Billiot Dep.) at 60:4-10, 62:10-12; Ex. B (Boehnke Dep.) at 41:1-3 (Q: "So at no time did you ever see him raise his weapon, did you?" A: "No.").

**RESPONSE: Deny, as Billiot testified that he raised his carbine rifle toward Tousis and**

12

pointed it at him. Defendant's Ex. A (Billiot Dep.), 66: 19-22 ("Q: At this point in time was –
did you raise your gun?; A: I raised my weapon the moment that I came to a stop. So my
weapon was already raised."); 74: 14-16 ("A: When you say aim, my weapon was pointed at
him; as I said earlier, when I reached for my weapon, my weapon was pointed at him
[Tousis]."), 101: 13-15 ("Q: When you [Billiot] fired your weapon, were you aiming at Gus
Tousis?; A: Yes, sir, I was.").

44.     As Tousis reversed his SUV, Special Agent Billiot ran toward Tousis. Ex. A (Billiot
Dep.) at 62:13-19.

RESPONSE: Deny that Tousis's vehicle reversed (Plaintiff's SOF (Statement of Facts) ¶ 41),
and admit to the extent that Billiot ran toward Tousis's vehicle, with the additional
information that Billiot ran as fast as he could straight toward Tousis's vehicle, more
toward the driver's side, with nothing between his person and Tousis's vehicle, despite
claiming he had no time to get out of the way, knowing he was going to be struck.
Defendant's Ex. A (Billiot Dep.), 62: 23 – 63: 3 ("A: I [Billiot] ran directly toward –
specifically with respect to the front of the vehicle, directly toward Gus Tousis himself. So,
yes, the front of the vehicle but I was in nearly a straight line, as straight as it could be with
Gus Tousis."); 66: 10-18 ("Q: And he's [Tousis] at this point still in the left lane heading
northbound?; A: Yes, sir, that's correct.; Q: And you were standing in the left lane,
correct?; A: Yes, sir.; Q: And there is nothing between you and his vehicle, correct?; A:
That's correct."); 72: 18-21 ("A: I was directly in front of the vehicle but literally, to the best
of my recollection, directly in front of Gus Tousis. We were straight – he was straight in
front of me."); 72: 24 – 73: 1 ("A: We were straight in line with each other."); 76: 4-5 ("A:
So I am to the driver's side of the very center of his [Tousis] vehicle."); 103: 23 – 104: 3 ("A:
I was running as fast as I could toward his vehicle. So the moment he stopped, I – I tried to

13

**stop as quickly as I could; which when I did stop, it positioned me directly in front of him.");**
**104: 6-8 ("A: I had no time to get out of the way. I mean, I knew I was going to be struck, I**
**knew I was going to be hit."); Defendants' Ex. B (Boehnke Dep.), 39: 19-21 ("A: For him**
**[Billiot] to get out, he would have been somewhat in front of Tousis's vehicle the way he**
**blocked him."), 40: 11-14 ("Q: And when he exited the vehicle, what did you see him [Billiot]**
**do?; A: Go more towards the driver's side.").**

45.      Tousis's SUV "came to a very abrupt stop," and Special Agent Billiot stopped,
raised his carbine, and yelled "police" and commanded Tousis to turn the vehicle off and get out.
Ex. A (Billiot Dep.) at 62:13-63:24, 65:10-66:2, 66:19-22, 67:18-68:8 ("I remember identifying
myself as literally screaming police and, again, commanding him to turn the vehicle off and get
out of the vehicle."); Ex. G (Braun Dep.) at 56:16-19 ("He had his weapon raised.").

**RESPONSE: Admit to the extent that Defendant Billiot testified that he stopped, raised his**
**carbine rifle, and shouted commands to Tousis, but deny that the vehicle came to a very**
**abrupt stop, as it is disputed whether Tousis's vehicle reversed. Plaintiff's SOF ¶ 41.**

**Tousis's Assault and Battery Against Special Agent Billiot**

46.      As Special Agent Billiot shouted orders at Tousis, Tousis's vehicle was still in the
left lane facing northbound, and Special Agent Billiot was standing in that lane, with nothing
between them.  Ex. A (Billiot Dep.) at 66:10-18; Ex. G (Braun Dep.) at 56:20-22.

**RESPONSE: Admit.**

47.      Special Agent Billiot was standing in front of Tousis's vehicle, "straight in front of
Gus Tousis." Ex. A (Billiot Dep.) at 72:15-73:1 ("It wasn't that I was off so much to his driver's
side that I was looking to my left and nor was I off to his passenger side and looking to the right.
We were straight in line with each other."), 103:21-104:3 ("As I said, he came to an abrupt stop, I
was running as fast as I could toward his vehicle.  So the moment he stopped, I—I tried to stop as

14

quickly as I could; which when I did stop, it positioned me directly in front of him.").

**RESPONSE: Admit.**

48.     Suddenly, Tousis's vehicle lurched toward Special Agent Billiot. Ex. A (Billiot Dep.) at 66:3-9, 73:1-3; Ex. B (Boehnke Dep.) at 42:3-19 ("the reverse lights went off, and then I saw the car go forward"), 44:16-19 (Q: "Did you see it go forward?" A: "Yes." Q: "Which direction did it go forward?" A: "Straight north."), 45:21-23, 47:5-7; Ex. F (Police Report) at DEA_0072 ("Tousis drove his vehicle at Agent Billiot"); Ex. H (Supplementary Police Report) atDEA_0069 ("The vehicle then drove forward at him").

**RESPONSE: Admit to the extent that the vehicle moved forward, but with the additional information that Tousis's vehicle veered to the right, the right-hand lane was clear of traffic, and Tousis's vehicle entered the righthand lane. Defendant's Ex. A (Billiot Dep.) 104: 24 – 105: 5 ("Q: But isn't it a fact that the vehicle was actually veering toward its – toward the right towards the other lane of traffic?; A: It is – I would agree that it is a fact that it wound up there."); 70: 13-21 ("A: Immediately to my left is a second lane that's northbound on Central; that of course when you traverse the lane, there is a curb there and a concrete sidewalk or such there.; Q: Were there cars still going northbound?; A: I – it would be speculation if you want me to speculate, but I'll – the lane was open. There was no – again, the lane was not blocked."); Plaintiff's SOF ¶ 56.**

49.     Special Agent Billiot was so close to the vehicle when it began to move that he could not have moved out of the way. Ex. A (Billiot Dep.) at 73:4-13 ("I was so close to his vehicle . . . as he began to move that . . . there was no way that I could have gotten away from his vehicle. He was moving that quickly and the distance was so small."), 75:4-13 (describing Billiot as being "very close" to the front of Tousis's vehicle), 104:4-11 ("I had no time to get out of the way.").

**RESPONSE: Deny, as Billiot positioned his vehicle in front of Gus Tousis's vehicle, with his**

driver's side door directly in front of Tousis's vehicle, jumped out of his vehicle and ran as fast as he could directly toward the front of Tousis's vehicle with his carbine rifle drawn. Defendant's Ex. A (Billiot Dep.), 56: 23—57: 2 ("Q: So you [Billiot] cut him [Tousis] off?; A: Yes, sir.; Q: And did he [Tousis] slam on the breaks?; A: He [Tousis] came to a stop pretty abruptly."); Defendant's Ex. B (Boehnke Dep.), 39: 7-14 ("Q: So you indicated that when Billiot pulled in front of Tousis facing northwest, he – you saw him [Billiot] jump out of the car?; A: Yes.; Q: And was his driver's door lined up with the front of Tousis's car?; A: I mean what do you mean by lined up? I mean at some point, yeah."); Defendant's Ex. A (Billiot Dep.), 59: 4-7 ("Q: You're a sitting duck because your door – I mean, his [Tousis's] car is aimed directly at your driver's door, correct? A: That is true."); 57: 6-8 ("Q: [Y]our [Billiot] driver door is closer to his vehicle than your passenger door at this point?; A: Yes, sir."); 62: 23 – 63: 3 ("A: I [Billiot] ran directly toward – specifically with respect to the front of the vehicle, directly toward Gus Tousis himself. So, yes, the front of the vehicle but I was in nearly a straight line, as straight as it could be with Gus Tousis."); 66: 10-18 ("Q: And he's [Tousis] at this point still in the left lane heading northbound?; A: Yes, sir, that's correct.; Q: And you were standing in the left lane, correct?; A: Yes, sir.; Q: And there is nothing between you and his vehicle, correct?; A: That's correct."); 72: 18-21 ("A: I was directly in front of the vehicle but literally, to the best of my recollection, directly in front of Gus Tousis. We were straight – he was straight in front of me."); 72: 24 – 73: 1 ("A: We were straight in line with each other."); 76: 4-5 ("A: So I am to the driver's side of the very center of his [Tousis] vehicle."); 103: 23 – 104: 3 ("A: I was running as fast as I could toward his vehicle. So the moment he stopped, I – I tried to stop as quickly as I could; which when I did stop, it positioned me directly in front of him."); 66: 19-22 ("Q: At this point in time was – did you raise your gun?; A: I raised my weapon the moment that I came to a stop. So my

weapon was already raised."); 74: 14-16 ("A: When you say aim, my weapon was pointed at him; as I said earlier, when I reached for my weapon, my weapon was pointed at him [Tousis]."), 101: 13-15 ("Q: When you [Billiot] fired your weapon, were you aiming at Gus Tousis?; A: Yes, sir, I was.").

50.     Tousis's vehicle struck Billiot in the chest, torso, and waist area. Ex. A (Billiot Dep.) at 75:14-23 (Tousis's vehicle "hits my chest beneath my arm level. It is not just my chest but obviously my—you know, the—my torso to the waist area too."), 104:12-15; Ex. G (Braun Dep.) at 53:13-23.

RESPONSE: Deny, as Gus Tousis's vehicle did not strike Defendant Billiot. There is no damage to the front of Tousis's vehicle where it allegedly struck Defendant Billiot, indicating no collision occurred. There is no allegation of injury to his chest, torso, or waist, but only to his back. His complaints of pain were that of his back, not his chest, torso, or waist. Billiot did not ride in an ambulance to the hospital. His injuries were not severe enough to be admitted, as he was treated and released that same day. Defendant's Ex. O (Supplementary Police Report) at DEA 0061 ("The officer fell to the ground although he didn't think the vehicle struck the officer."); Plaintiff's Ex. 3 (Photograph of front of driver side of Tousis's vehicle) at DEA_0402; Plaintiff's SOF ¶67; Defendant's Ex. G (Braun Dep.), 54: 4-6 ("A: He had such pain in his lower back – that is where he was having the most pain, the lower back from being struck by the curb."); 54: 13-15 ("A: His most severe injuries and the chief complaints he had came from his hitting the back on the curb."); 54: 23 ("A: He [Billiot] was treated and released."); 55: 7-8 ("A: I was not informed he had any broken bones, no."); 55: 9-11 ("Q: Or any internal injury from being struck by a car?; A: Not that I'm aware of, no."); Defendant's Ex. A (Billiot Dep.), 98: 1-2 ("A: I did not travel to the hospital in an ambulance.").

51.     Special Agent Billiot was in line with the steering wheel of Tousis's vehicle when he was struck.  Ex. A (Billiot Dep.) at 75:24-76:5, 104:16-23.

**RESPONSE: Deny, as Defendant Billiot was not struck by Gus Tousis's vehicle, and Defendant Billiot moved toward and positioned himself at the front near the driver side of Tousis's vehicle.  Defendant's Ex. O (Supplementary Police Report) at DEA 0061 ("The officer fell to the ground although he didn't think the vehicle struck the officer."), ("An officer positioned himself in front of the vehicle near the driver's side fender."); Plaintiff's SOF ¶50; Defendant's Ex. B (Boehnke Dep.), 40: 11-14 ("Q: And when he exited the vehicle, what did you see him [Billiot] do?; A: Go more towards the driver's side."); Defendant's Ex. G (Braun Dep.), 57: 6-7 ("As he [Billiot] *was being glanced* by the vehicle, he discharged his weapon.") (emphasis added); Plaintiff's SOF ¶ 56.**

52.     Special Agent Billiot was thrown backwards from the impact of being struck by the vehicle and landed "some distance back," with his back and head on the curb of the median. Ex.A (Billiot Dep.) at 76:6-8, 77:1-19, 95:7-16; Ex. B (Boehnke Dep.) at 48:18-22 ("He landed in the median area."); Ex. G (Braun Dep) at 53:24-54:10; Ex. H (Supplementary Police Report) at DEA_0069 (impact caused Billiot "to fall to ground striking back on the curb of the median").

**RESPONSE: Deny that Defendant Billiot was struck by Tousis's vehicle (Plaintiff's SOF ¶¶ 50-51), and admit that Defendant Billiot landed on the curb of the median, with the additional information that Defendant Billiot was backpedaling toward the median carrying his carbine rifle. Defendant's Ex. B (Boehnke Dep.), 48: 4-5 ("A: I saw Keith [Billiot] back-pedaling and fall down into the median."), 48: 18-20 ("Q: When you saw Keith [Billiot] back-pedaling, did you – did you see him fall?; A: Yes."), 49: 15-22 ("Q: And when you saw Keith [Billiot] back-pedaling, he still had the rifle in his hand?; A: Yes.; Q: And when you saw him fall, did he still have the rifle in his hand?; A: Yeah. I don't know if he dropped it**

18

as he fell, but, yeah, he still had the rifle.").

**The Shooting**

53. Special Agent Billiot pulled the trigger of his carbine at almost the same time he was struck by Tousis's vehicle. Ex. A (Billiot Dep.) at 74:9-11, 75:4-13 (describing the two events as being "as close to simultaneously as I personally think is humanly possible"), 76:9-24 ("the analogy would be if I said, bam, bam . . . I know you can't hear that on the—it would have been very quick, like I said, the equivalent of bam, bam, that's how quick it was"), 102:17-20 ("the only time I had was to pull the trigger once and then I was immediately struck by the vehicle"), 104:4-11 ("I fired, as I said, it was bam, bam, the firing and getting struck or getting struck and firing, whichever way it happened."), 105:20-106:12 ("I just know that it was very, very near simultaneously; the two events occurred near simultaneously, that's the best I can do."); Ex. F (Police Report) at DEA_0072 (Special Agent Billiot "discharged his weapon into the vehicle as he was simultaneously struck by the vehicle"); Ex. H (Supplementary Police Report) at DEA_0069("In fear for his life, he [Billiot] discharged one round as he was simultaneously struck by the front driver's side of the vehicle . . ."); Ex. G (Braun Dep.) at 32:1-21 ("From his [Billiot's] statement, it was a simultaneous occurrence  he was being glanced by the front end of the truck when he discharged his weapon, is the statement he provided."), 56:23-57:7 ("He was being struck while he fired. The way he presented it [w]as it was simultaneous. As he was being glanced by the vehicle, he discharges his weapon.").

**RESPONSE: Deny that Defendant Billiot was struck by Tousis's vehicle (Plaintiff's SOF ¶¶ 50-51), and deny that the acts claimed of, one of which did not occur, happened simultaneously, because as soon as Tousis's vehicle pulled forward, Billiot fired his weapon. Defendant's Ex. A (Billiot Dep.), 106: 10-12 ("Q: So as soon as the vehicle started pulling forward, you pulled the trigger?; A: To the best of my recollection, yes, sir."); 106: 2-9 ("Q:**

So from the time that the vehicle started moving forward to the time that it – you pulled the trigger was less than a second?; A: Again, sir, I have no idea. I certainly wasn't trying to time it. There is no way of knowing. I just know that it was very, very near simultaneously; the two events occurred near simultaneously, that's the best that I can do.").

The distance between Defendant Billiot and Tousis at the time of the shooting is in dispute, as Defendant Billiot pulled his vehicle in front of Tousis's vehicle with his driver side door nearest the front of Tousis's vehicle (Plaintiff's SOF ¶ 38), with an estimated distance between Defendant Billiot and Tousis at least 10 feet and at most 25 feet away from each other when Defendant Billiot exited his vehicle, and Defendant Billiot ran as fast as he could directly toward Tousis's vehicle (Plaintiff's SOF ¶ 44, 49), shortening the distance between them. Defendant's Ex. A (Billiot Dep.), 58: 9- 20 ("Q: Give me a ballpark figure about how far your [driver] door was from the front of his car when he stopped . . . A: If I had to speculate, I would say somewhere between the – between the front of his car and my door which, yeah, I don't know, maybe it was only – yeah, I would say somewhere between 10 and 20 feet, or maybe 10, 25 feet.").

54.    Special Agent Billiot fired his carbine because he believed it was his only chance of staying alive. Ex. A (Billiot Dep.) at 101:9-12 (Q: "Tell me why you fired your weapon."  A: "I fired my weapon, sir, because I believed it was the only possible chance I had of staying alive.").

RESPONSE: Deny, as the timing of the shot (Plaintiff's SOF ¶ 53), distance between Defendant Billiot and Tousis (Plaintiff's SOF ¶ 53), whether Defendant Billiot was struck (Plaintiff's SOF ¶50-51), and the positioning of Defendant Billiot and Tousis (Plaintiff's SOF ¶ 44, 49, 56) are in dispute to the extent that that it cannot be conclusively determined that Defendant Billiot's life was in danger.

55.    When Special Agent Billiot fired, he was aiming the carbine at Tousis. Ex. A

20

(Billiot Dep.) at 101:13-15, 102:4-11 (the carbine was "pointed right at" Tousis).

**RESPONSE: Admit.**

56.     The bullet from Special Agent Billiot's carbine entered the windshield of Tousis's

vehicle "in a very straight line with the center of the steering wheel," striking Tousis in the front

of the neck.  Ex. A (Billiot Dep.) at 107:7-24; Ex. B (Boehnke Dep.) at 63:4-9 ("it was almost right

down the center of the steering wheel, like right through the windshield"), 63:10-12 (Q: "And

where was the bullet hole in Tousis's body?" A: "In his neck." Q: "The front of his neck?" A:

"Yeah."); Ex. G (Braun Dep.) at 57:8-15 ("The bullet struck the upper portion of the steering

wheel, shattered, and a small fragment is what nicked Tousis's neck."); Ex. F (Police Report) at

DEA_0081 ("A single bullet hole was observed in the front windshield on the driver's side of the

vehicle which corresponded with a bullet strike on the steering wheel."); Ex. I (Supplementary

Police Report) at DEA_0063; Ex. J (photograph of bullet hole).

**RESPONSE: Deny, as the bullet struck the steering wheel off-center to the left from the top**

**of the steering wheel. Plaintiff's Ex. 1 (Photograph of steering wheel) at DEA_415.**

**Comparing the location where the bullet struck the steering wheel to where the bullet struck**

**the windshield (Plaintiff's Ex. 2 – Photographs of bullet hole in windshield, at DEA_0397-**

**398), the positioning indicates that Tousis was turning his wheel to the right, maneuvering his**

**vehicle away from Billiot, and Billiot was angled to the driver side of the front end of Tousis's**

**vehicle. Defendant's Ex. O (Supplementary Police Report) at DEA 0061 ("An officer**

**positioned himself in front of the vehicle near the driver's side fender.")**

57.     The incident took place at around 8:37 a.m., on a bright and clear day.  Ex. F (Police

Report) at DEA_0072; Ex. A (Billiot Dep.) at 63:8-9 ("it was very bright that morning").

**RESPONSE: Admit.**

58.     Aside from this incident, in his 29 years with the DEA, Special Agent Billiot never

fired his weapon outside of a training environment.  Ex. A (Billiot Dep.) at 21:3-24.

**RESPONSE: Admit.**

**Aftermath**

59.    After the gunshot, Tousis's SUV veered off to the right, heading northeast, struck a street pole and went over the curb and came to a stop with what appeared to be a broken axle. Ex. B (Boehnke Dep.) at 46:5-8, 47:11-24; Ex. F (Police Report) at DEA_0072 ("Tousis veered off of the road and struck a light pole before coming to a rest."); Ex. H (Supplementary Police Report) at DEA_0069 ("The vehicle then veered to the right and slammed into a light pole as it jumped the far curb onto the embankment.").

**RESPONSE: Admit.**

60.    Tousis's car moved fast enough that when it hit the street light pole the front right wheel and was torn off and the axle was broken. Ex. A (Billiot Dep.) at 73:22-74:4; Ex. K (photograph of broken wheel).

**RESPONSE: Admit.**

61.    Officer Boehnke pulled up behind Tousis's SUV and approached, where he saw that Tousis was slumped down and bleeding from the neck.  Ex. B (Boehnke Dep.) at 50:24-51:11.

**RESPONSE: Admit.**

62.    Officer Boehnke tried to open Tousis's vehicle, but the doors were locked. Ex. B (Boehnke Dep.) at 51:14-19. He tried to break the window open with his hand without success. *Id*. at 51:22-52:10.

**RESPONSE: Admit.**

63.    Special Agent Billiot, who had gotten "back up on his feet," approached and tried to break the window with a device called a "window break," but the device itself broke. Ex. B (Boehnke Dep.) at 52:13-53:11, 54:10-13; Ex. H (Supplementary Police Report) at DEA_0069

("Billiot related he attempted to break the window with a small utility tool which broke apart."). Special Agent Billiot then retrieved a baton, or "asp," from his vehicle and struck Tousis's window with the asp, but that did not work, either. Ex. B (Boehnke Dep.) at 53:12-15, 55:3-13.

**RESPONSE: Admit.**

64.     When Special Agent Billiot first approached Officer Boehnke outside Tousis's car, Special Agent Billiot said either, "I had to," or, "I had to, he hit me." Ex. B (Boehnke Dep.) at 19:16-20:1, 55:19-56:3 (recalling the former); Ex. F (Police Report) at DEA_0080 (stating the latter).

**RESPONSE: Admit that Defendant Billiot stated "I had to," but deny that Defendant Billiot said, "he hit me." Defendant's Ex. B (Boehnke Dep.), 19: 22 – 20: 1 ("A: I remember him [Billiot] stating that 'I had – I had to.' I don't remember if I said he hit me or any second part of that."); 55: 22-24 ("A: I remember him [Billiot] – when we were trying to break the window, he just looked at me, he's like 'I had to.'"); 56: 2-3 ("A: I don't remember that exact 'he hit me' portion of it.").**

65.     An Illinois Department of Transportation worker arrived and broke the window with a sledgehammer, and Officer Boehnke pulled Tousis out of the vehicle with assistance from another agent, Vic Almaguer, who had arrived. Ex. B (Boehnke Dep.) at 53:17-54:8, 56:22-24; Ex. E (DEA Report of Investigation) at DEA_0117 ¶ 20; Ex. L (Supplementary Police Report) at DEA_0085. Special Agent Billiot went to retrieve a first aid kit. Ex. B (Boehnke Dep.) at 57:1-6.

**RESPONSE: Admit.**

66.     Tousis was taken to Loyola Hospital, where he was pronounced dead. Ex. F (Police Report) at DEA_0072.

**RESPONSE: Admit.**

67.     Special Agent Billiot was taken to Mt. Sinai Hospital, where he was treated for injuries to his back. Ex. F (Police Report) at DEA_0072; Ex. G (Braun Dep.) at 46:8-47:3, (doctor stated Billiot had "injuries consistent with being struck by a vehicle"), 52:19-53:3.

**RESPONSE: Admit that Defendant Billiot was taken to Mt. Sinai Hospital and treated for injuries to his back, but with the additional information that the supporting statement that Billiot had "injuries consistent with being struck by a vehicle" is hearsay as should be deemed inadmissible. That statement came from CPD Detective James Braun's report, which itself came from Det. Patrick Loftus's spoken statement to Det. Braun, which itself came from an unidentified doctor. This statement is medical opinion and should be discounted because it did not come from a medical expert or medical report. Det. Braun is not qualified as an accident reconstructionist. Det. Braun never received Defendant Billiot's medical records. Defendant Billiot had spinal surgery approximately two-and-a-half months prior to the shooting, which could have been aggravated by the fall where he struck his back on the curb of the median. Defendant's Ex. G (Braun Dep.), 46: 10-11 ("A: I [Braun] was at the scene when he [Billiot] left for the hospital."); 53: 1-6 ("A: I received that information from Detective Patrick Loftus who went to Mount Sinai and spoke to the doctor.; Q: Did you ever get his medical records, Billiot's?; A:No, I did not."); Defendant's Ex. A (Billiot Dep.), 100: 15-18 ("Q: Prior to this incident, you had surgery on your spine?; A: I had surgery on my spine, yes, sir, approximately two and a half months prior.").**

68.     The Chicago Police Department recovered 301 grams of cocaine from Tousis's vehicle. Ex. F (Police Report) at DEA_0073 ("(2) clear plastic bags containing white powder suspect cocaine"); Ex. M (Supplementary Police Report) at DEA_0065-66 (describing transfer of custody from Chicago Police Department to DEA); Ex. E (DEA Report of Investigation) at DEA_0118 ("TOUSIS was found to be in possession of approximately 301.8 grams cocaine.");

Ex. N (lab report) (noting gross weight of 302.1 grams and net weight of 248.7 grams).

**RESPONSE: Admit.**

69.     The day after the shooting, a homeless man named Shaun Haymond, who lived

under an overpass near the incident, told police that he saw an officer position himself near the

front of the vehicle, that the vehicle began moving in the direction of the officer, that he heard a

gunshot, and that the officer fell to the ground.  Ex. G (Braun Dep.) at 37:3-14, 70:10-71:5; Ex. O

(Supplementary Police Report) at DEA_0060-61.

**RESPONSE: Admit.**

70.     Haymond also reported that he did not see a gun in the officer's hand, that he did

not think the vehicle struck the officer, and that he did not see the vehicle move in reverse before

driving toward the officer, and that he "was unsure as to whether the officer fired his weapon

before or after he fell to the ground."  Ex. O (Supplementary Police Report) at DEA_0060-61.

**RESPONSE: Admit.**

71.     DEA policy allows an agent to fire at a person driving a moving vehicle. Ex. A

(Billiot Dep.) at 108:19-109:3.

**RESPONSE: Admit to the extent that DEA policy allows an agent to fire at a person driving**

**a moving vehicle, with the additional information an agent can only do so if the vehicle**

**"poses an imminent danger of death or serious physical injury to the officer or to another**

**person." Plaintiff's Ex. 4 (News Article) at DEA_0245.**

72.     In 2014, a DEA agent named Anthony Anglada was seriously injured when a drug

trafficking suspect drove over him while trying to evade arrest. Ex. P (Myron Russell sentencing

transcript) at 31-32 ("[Anglada] was actually struck by a several ton motor vehicle and run over[,]

tire marks on his arm.  The back of his head looks like it went through a meat grinder.").

**RESPONSE: Plaintiff cannot either admit or deny this allegation as it was not admitted in**

evidence and because it is irrelevant, immaterial, and prejudicial to Plaintiff. This SOF should be stricken from the record. This fact, even if true, does not offer any probative value to the issue or facts of this case.

<u>Plaintiff's Additional Material Facts</u>

73.     Special Agent Boehnke stated that the summary of his interview by Det. James Braun was accurate in the description of the incident. Defendant's Ex. B (Boehnke Dep.), 20: 2-7 ("Q: But the rest of it appears to be accurate?; A: Let me double check. (WHEREUPON, witness peruses the document.) Yes.").

74.     Boehnke related to Det. Braun that he "continued to that area and observed the target vehicle stopped at the northbound traffic signal. As he was pulling up behind the target vehicle he heard a single gunshot and then observed Agent Billiot fall to the ground." Boehnke "related he then observed the target vehicle accelerate quickly and veer off to the right before striking a street light and coming to a stop." Defendant's Ex. F, Case Supplementary Report at DEA_0080.

75.     Defendant Billiot stated that he did not immediately exit his vehicle because he did not want to risk being struck by Tousis's vehicle. Defendant's Ex. A (Billiot Dep.), 56: 1-2 ("I didn't get out immediately because I did not want to risk being run into.").

76.     Defendant Billiot's driver side door was close enough to Tousis's vehicle that Defendant Billiot felt concerned that if he exited his vehicle at the time he stopped in front of Tousis's vehicle, that he would be in great danger because of the risk of being struck by Tousis's vehicle. Defendant's Ex. A (Billiot Dep.), 58: 23 – 59: 2 ("A: Fairly close. Close enough that I felt concerned that if I get off my car right now and he says he's going to run into me, there is – I would be in great danger.").

77.     Defendant Billiot exited his vehicle with his carbine rife drawn because he

26

feared risk to civilians by Tousis, but there was no active police chase (Plaintiff's SOF ¶¶ 20, 25, 27), no high rate of speed (Plaintiff's SOF ¶¶ 21, 27), or threat to civilians at the time Defendant Billiot cut in front of Tousis's vehicle (Plaintiff's SOF ¶¶ 38-40). Defendant's Ex. A (Billiot Dep.) 60: 23 – 61: 7 ("A: Sure. My concern, my reason for getting out of the car was because I was concerned going in reverse that he would run into someone that was coming northbound, either Bob or anyone else, any civilian because the roadway was not blocked off. There were still – there could have been vehicles that were innocent civilian just going – proceeding northbound in the other lane. So that's why I got out of my car.").

78.     Boehnke assumed Tousis had reversed so he could back up to get around Defendant Billiot. Defendant's Ex. B (Boehnke Dep.), ("Q: Well, what was your – what did you think was going on at that point when both cars were reversing or at least two cars were reversing?; A: I was assuming he [Tousis] was trying to back up to get around.").

79.     Defendant Billiot's vehicle was located behind him when he fired his weapon. Defendant's Ex. G (Braun Dep.), 48: 8-13 ("Q: Did you ask him [Billiot] where his vehicle was when—; A: It was behind him.; Q: Did you ask him how far his vehicle was from him when he fired? A: I do not believe I did.").

80.     Defendant Billiot had no knowledge that Tousis carried a weapon or had ever been arrested for unlawful use or possession of a weapon. Defendant's Ex. A (Billiot Dep.), 67: 6-13 ("Q: Prior to this time, did you have any knowledge that Gus Tousis ever carried a firearm?; A: I don't recall ever having such knowledge.; Q: And you had no knowledge that he was ever arrested for unlawful use of a weapon or unlawful possession of a weapon, correct?; A: I don't recall having any such knowledge.").

81.     Defendant Billiot did not run toward Tousis's vehicle after it crashed, nor did he have anything to do with the extrication process. Defendant's Ex. A (Billiot Dep.), 93: 4-5

("I got to the vehicle but I certainly wouldn't describe it as running."), 94: 12-13 ("I had nothing to do with the extrication."), 97: 6-8 ("Q: You didn't assist in getting him out, did you?; A: No, sir, I did not.").

82.     Defendant Billiot does not believe he caused the death of Gus Tousis. This is ultimately a question of fact for the jury's determination. Defendant's Ex. A (Billiot Dep.), 109: 4-14 ("Q: Okay. It is your understanding that as a result of you pulling the trigger, this caused the death of Mr. Tousis, correct?; A: It is absolutely not. It is absolutely not.; Q: What caused his death?; A: Gus Tousis caused his death. Gus Tousis made the decision to run into, intentionally run into a law enforcement officer who's trying to do his job, and that's what caused Gus Tousis's death.").

83.     Defendant Billiot was scheduled for a pre-approved leave to start the Monday following the shooting. Defendant's Ex. A (Billiot Dep.), 109: 15 – 110: 9 ("Q: Did you go to— did you take any time off work after this incident?; A: I did but it was pre—it was already— my leave request was already in, I had already been approved.; Q: Well, did you go to work the next day?; A: No, I did not.; Q: Well, so your leave was already pre-approved starting the next day?; A: My leave was pre-approved prior to this incident.; Q: When was your leave to begin? A: Whichever—whatever the—so the leave, that—this—the incident took place on a Saturday, the leave was scheduled to begin on Monday. My leave would have began that Monday.").

84.     Aleia Tousis filed this lawsuit because she seeks justice for her father's unjustifiable killing. Plaintiff's Ex. 5 (Aleia Tousis Dep.), 21: 22-24 ("Q: Why did you decide to file this will lawsuit?; A: I wanted justice for my father."), 22: 5-9 ("Q: It sounds like you said the purpose is to achieve justice, so I'm just asking in what way do you expect it to or hope it will.; A: Just to prove that he [Tousis] was unjustifiably shot and killed.").

28

85.     Aleia Tousis believes that her father, Gus, was not trying to hurt Defendant Billiot, because he is not an aggressive or violent person. Plaintiff's Ex. 5 (Aleia Tousis Dep.), 22: 14-15 ("I don't believe that he was trying to hurt the DEA officer [Billiot]."), 22: 18-21 ("A: Because my father [Tousis] has never shown any signs of violence toward me or any other person, so I don't believe that he would do that to another person.").

Respectfully submitted,

*/s/ Vincenzo B. Caporale*
*One of Plaintiffs' Attorneys*

Vincenzo B. Caporale #6335651
Gregory E. Kulis & Associates, Ltd.
30 N. LaSalle Street, Suite 2140
Chicago, IL 60602
P. 312.580.1830
E. gkulis@kulislawltd.com
E. vcaporale@kulislawltd.com

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ALEIA TOUSIS, as Special Administrator of )
the Estate of GUS TOUSIS, )
)
Plaintiff, )  No. 20 C 3012
)
v. )
)  Judge Coleman
SPECIAL AGENT KEITH BILLIOT, )
)
Defendant. )

**INDEX OF EXHIBITS TO**
**PLAINTIFF'S RULE 56.1 STATEMENT OF MATERIAL FACTS**

| | |
|---|---|
| Exhibit 1 | Photograph of steering wheel (DEA_0415) |
| Exhibit 2 | Photograph of bullet hold in windshield (DEA_0397-0398) |
| Exhibit 3 | Photograph of front driver's side of Tousis's vehicle (DEA_0402) |
| Exhibit 4 | News Article (DEA_0245) |
| Exhibit 5 | Transcript of Aleia Tousis's deposition |

**Respectfully submitted,**

**/s/ Vincenzo B. Caporale**
*One of Plaintiffs' Attorneys*

**Vincenzo B. Caporale #6335651**
**Gregory E. Kulis & Associates, Ltd.**
**30 N. LaSalle Street, Suite 2140**
**Chicago, IL 60602**
**P. 312.580.1830**
**E. gkulis@kulislawltd.com**
**E. vcaporale@kulislawltd.com**